UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CARL R. ANDERSON,

                              Plaintiff,

                                                              **MEMORANDUM**
                                                              **AND ORDER**

          -against-                                           22-cv-01509 (JMW)


COMMISSIONER OF THE SOCIAL SECURITY
ADMINISTRATION,

                              Defendant.
-------------------------------------------------------------X

**A P P E A R A N C E S:**

          Daniel Adam Osborn
          **Osborn Law P.C.**
          43 West 43rd Street, Suite 131
          New York, NY 10036
          *Attorney for Plaintiff*

          Geoffrey Michael Peters.
          Special Assistant U.S. Attorney
          **Office of Program Litigation 2**
          6401 Security Boulevard
          Baltimore, MD 21235
          *Attorney for Defendant*

          Nicol Fitzhugh
          **Social Security Administration**
          6401 Security Boulevard
          Baltimore, MD 21235
          *Attorney for Defendant*

**WICKS,** Magistrate Judge:

          Plaintiff Carl R. Anderson ("Plaintiff" or "Anderson") seeks judgment on the pleadings

(ECF No. 20), and vacatur of the final decision by the Commissioner of Social Security

("Commissioner" or "Defendant"), reached after a hearing before an Administrative Law Judge

1

("ALJ"), the result of which denied his application for disability insurance benefits ("DIB") and child's disability insurance benefits ("CDB")[1]. In response, Defendant cross-moves for judgment on the pleadings, requesting that the Court grant its motion, deny Plaintiff's motion, and affirm the ALJ's decision. (ECF No. 18.) For the reasons set forth below, Plaintiff's motion (ECF No. 20) is **DENIED**, Defendant's cross-motion (ECF No. 18) is **GRANTED**, and the ALJ's decision is hereby **AFFIRMED**.

## BACKGROUND

### I.    Factual Background

#### a.    *Plaintiff's Application for Disability Benefits*

The following facts are taken directly from the parties' stipulation of facts filed at ECF No. 19.

Plaintiff was born in March of 1990 and alleged he became disabled beginning March 15, 1990 due to schizophrenia, psychotic disorder, general anxiety disorder, learning disorder, and glycogen storage Disease ("GSD"), type 3B.[2] (ECF No. 19 at ¶¶ 1-2). Plaintiff's application for DIB was filed on November 19, 2019 and his application for CDB was filed on December 17,

---

[1] CDB, formally known as disabled adult child (DAC) benefits, is payable to the child of an insured person who has died, retired, or become disabled; is or was dependent on the insured person; is unmarried; and under a disability, as defined in the Act, before attaining the age of 22, and that the disability has continued. 42 U.S.C. § 402(d)(1); 20 C.F.R. § 404.350(a)(5); *see Hanlon v. Saul*, No. 18-CV-7090 (PKC), 2020 WL 999900, at *2 (E.D.N.Y. Mar. 2, 2020) ("The Social Security Act provides disability insurance benefits for a disabled adult child . . . if the claimant is 18 years old or older and has a disability that began before the claimant became 22 years old.") (quotation marks and citation omitted).  The child disability claim is evaluated using the same standard used "in traditional, adult disability cases." *Hanlon*, 2020 WL 999900, at *2 (quotation marks and citation omitted).

[2] "Glycogen storage disease type 3 (GSDIII) is an inherited disorder caused by the buildup of glycogen in the body's cells. This buildup impairs the function of certain organs and tissues, especially the liver and muscles." *Glycogen storage disease type 3*, National Institutes of Health (Nov. 8, 2021) https://rarediseases.info.nih.gov/diseases/9442/glycogen-storage-disease- type-3 .

2019. (*Id.* at ¶ 1.) To be eligible for CDB, Plaintiff had to prove that he was disabled from February 28, 2008, through March 14, 2012, the time period where he was aged 18 to 22.[3] (*Id.* at ¶ 8.) For his DIB claim, Plaintiff had to prove he was disabled from April 1, 2010, through September 30, 2011, the period that he was insured for benefits. (*Id.* at ¶ 9.) Both applications were initially denied on March 6, 2020 and denied again upon reconsideration on August 18, 2020. (*Id.* at ¶ 3.)

Following a February 4, 2021, oral hearing, the ALJ issued two decisions on February 19, 2021, addressing Plaintiff's DIB and CDB claims, respectively. (*Id.* at ¶ 4.) As to the DIB claim, the ALJ found Plaintiff was not disabled at any time from April 1, 2010, through September 30, 2011, the period that Plaintiff was insured for DIB on his own earnings record. (*Id.* at ¶ 5.) As to the CDB claim, the ALJ found Plaintiff was not disabled at any time from February 28, 2008, through March 14, 2012, the period wherein Plaintiff was 18 to 22 years old and was insured on his father's earning record. (*Id.* at ¶ 6.)

### b. *Testimony at Administrative Hearing*

At Plaintiff's administrative hearing on February 4, 2021, Christine Spaulding, a vocational expert, testified that, based on her education, training, and experience, an individual of Plaintiff's age and education with no past work experience, and one who hypothetically could perform simple, routine, low-stress tasks, could work in the national economy, like a hand

---

[3] The period from February 28, 2008 to March 14, 2012 was commonly referred to as "the Relevant Period" in the parties joint stipulation of facts, namely because that period spans the applicable disability period for the DIB and CDB claim. To be entitled to CDB, a claimant must be the child of a disabled individual and establish that he or she was disabled before the age of 22. *See Ackerman v. Colvin*, No. 13-CV-6675 (RLE), 2015 WL 1499459, at *7, *11 (S.D.N.Y. Mar. 31, 2015); *see also* C.F.R. § 404.350(a)(5) (noting a claimant is entitled to CDB if he is 18 years old or older and has a disability that began before turning 22). Additionally, to be entitled to DIB, a claimant must establish a disability prior to the expiration of insured status. *Davis v. Colvin*, No. 6:14-cv-06373 (MAT), 2016 WL 368009, at *2 (W.D.N.Y Feb. 1, 2016).

packer, cleaning, and price marker jobs. (*Id.* at ¶¶ 19-20.) When asked what would happen if that same hypothetical employee was off-task 15% or more of the workday or would be absent from work one or more days per month, the vocational expert testified that off-task behavior above 10% of the workday or having two or more absences from work per month would preclude all employment. (*Id.* at ¶ 21.)

At this same hearing, Plaintiff testified that he had glycogen storage disorder, type 3, necessitating a feeding tube as a child, which was surgically removed at age 13. (*Id.* at ¶ 14.) While Plaintiff testified that he remains self-conscious about his disorder in general, he maintained that his physical disorder was not functionally limiting. (*Id.*) He later developed diabetes and testified that he did not use insulin to control his diabetes, but took metformin until his prescription had run out, a prescription that his providers did not renew (*Id.*) Moreover, he testified that he had mental health issues, feeling that people looked at him and read his thoughts. (*Id.* at ¶ 15.) In school, he had special education and was in Board of Cooperative Educational Services ("BOCES") programs and a Skills Unlimited program (vocational training). (*Id.*) He related having used marijuana, alcohol, and cocaine at times during his life, but as of the date of the hearing, he had been sober for one month. (*Id.*) Plaintiff further testified that he attended Alcoholics Anonymous meetings and had previously been hospitalized at Brentwood Hospital, and Stoney Brook East Long Island Hospital. (*Id.* at ¶ 17.)

Moreover, as stated, Plaintiff's mental health symptoms were worsening as of the hearing, and that he had trouble sleeping and nightmares when not using drugs. (*Id.* at ¶ 16.) He sleeps a lot, cannot sit for too long or stay in one place for too long, shops with someone from his family, and often does not get dressed and will wear the same clothes for two or three days. (*Id.*) In terms of care, Plaintiff testified that he had a history of working with therapists but, at the time

of the hearing, did not attend medical appointments due to the COVID-19 pandemic. (*Id.* at ¶ 17.) Instead, Plaintiff reported that he worked with a team of individuals – including a social worker and a nurse – who called and visited him to monitor his condition. (*Id.*) Plaintiff testified that he received medical injections and took oral medications, relying on reminders from his parents to take those medications. (*Id.*)

     **c.**   ***Medical Evidence and History***

     i.   <u>*Medical Evidence and History Prior to the Relevant Period – from 1991 Through February 2008*</u>

In 1991, as an infant, Plaintiff received care for GSD, a condition which remained relatively "unremarkable" up until Plaintiff turned 10 years old. (*Id.* at ¶¶ 24, 26.) In November 2000, at age 10, Plaintiff underwent an abdominal sonogram showing diffuse hepatic (liver) disease with hepatosplenomegaly. (*Id.* at ¶ 27.) In April 2001, Plaintiff was admitted overnight to North Shore University Hospital for metabolic monitoring. (*Id.* at ¶ 28.)

     ii.   <u>*Medical Evidence and History During the Relevant Period – February 28, 2008 Through March 14, 2012*</u>

In August 2008, at age 18, an ultrasound of Plaintiff's abdomen showed hepatosplenomegaly, "slightly larger" than a previous ultrasound had shown in November of 2000. (*Id.* at ¶ 32.) The following month, Plaintiff met with Alfred Slonim, M.D., for a review of his GSD and Dr. Slonim noted that Plaintiff had "been feeling well" and was "reasonably compliant" with a high protein diet. (*Id.* at ¶ 33.) Indeed, Plaintiff looked "well and was quite comfortable with his glycogen storage disease status," showed his liver was enlarged. (*Id.*) Dr. Slonim strongly encouraged Plaintiff to follow a strict diet, discontinue cigarette and marijuana use, and "undertake regular conditioning exercise." (*Id.*)

On February 6, 2012, at age 21, Plaintiff's parents brought him to counseling based on their concerns about his health given his liver disease and involvement with drugs and alcohol, and for concerns about marijuana and cocaine abuse, and that he was dealing drugs out of their home. (*Id.* at ¶ 36.) Plaintiff reported trying alcohol for the first time at age 12, daily marijuana use since age 15, and cocaine use beginning at age 17. (*Id.*) Plaintiff also reported symptoms of depression and anxiety, which were not treated with medication. (*Id.*) Plaintiff refused any treatment at that time. (*Id.*) Subsequently, on March 6, Plaintiff returned to counseling following a near arrest for drug possession and reported a willingness to try sobriety. (*Id.* at ¶ 37.) On March 13, Plaintiff reported ongoing cocaine use and a desire to stop using cocaine, but also stated that he wished to avoid treatment. (*Id.*) Then, on March 30, Plaintiff's case worker noted that Plaintiff "ha[d] not complied with outpatient treatment." (*Id.* at ¶ 38.)

### iii. *Medical Evidence and History After the Relevant Period – From April 2012 Through December 2020*

In June 2012, Plaintiff was discharged from psychiatric care with Krista Valz, Psy.D., after completing a residential treatment program and her diagnoses of Plaintiff included a psychotic disorder, polysubstance dependence, generalized anxiety disorder and learning disorder. (*Id.* at ¶ 39.) An exam showed Plaintiff appeared distractible, cooperative, able to resist urges, well-groomed, oriented, and alert with an unimpaired memory, no hallucinations, a constricted affect, anxious mood, and tangential speech. (*Id.*) Dr. Valz noted that Plaintiff had made "moderate" progress while in care and that Plaintiff's global assessment of functioning ("GAF") scores within the past year had ranged from 45-60.[4] (*Id.*)

---

[4] A GAF score in the range of 41 to 50 signifies serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Lawrie v. Astrue*, No. 11-CV-3517, 2013 WL 867229, at *5 (E.D.N.Y. Mar. 7, 2013) (quotation marks omitted). "A GAF score in the range of 51 to 60 signifies moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or

Subsequently, from October 2012 through August 2013, Plaintiff began meeting with Richard Pitch, M.D., regarding substance abuse issues. (*Id.* at ¶ 40.) During this period, Plaintiff reported some marijuana use and reported a stabilized, improved, or "good" mood during some visits. (*Id.* at ¶ 42.) Dr. Pitch initially diagnosed polysubstance dependence and encouraged sobriety and, in December 2012, reported that Plaintiff was "much more dedicated to a program of sobriety" and he was "not using marijuana at all." (*Id.* at ¶¶ 40-41.) Anderson reported that he wanted to resume treatment for management of depression, irritability and anxiety. (*Id.* at ¶ 41.) In a January 2013 medical report regarding disabilities, Dr. Pitch noted Plaintiff had been sober for nine months but still had sadness, apathy, struggles with initiative, some irritability and lack of energy, yet opined that Plaintiff had no physical limitations resulting in disability. (*Id.* at ¶ 45.)

By August 2013, Plaintiff reported he was "doing well" and was "[n]ot depressed" yet, according to his mother, Plaintiff appeared to "feel defiant of the law" and "immune to consequences." (*Id.* at ¶ 44.) In September 2013, Plaintiff sought treatment at the Pederson-Krag Center after relapsing on alcohol because of self-discontinuing his medications. (*Id.* at ¶ 46.) For treatment, restarting medications and therapy was recommended to help prevent relapse. (*Id.*) On October 28, 2013, Plaintiff began court-mandated substance abuse treatment at St. Charles Hospital. (*Id.* at ¶ 47.) Upon discharge on November 25, physician Mark Solomon, M.D. noted that Plaintiff "appeared to benefit from his rehab stay" diagnosed Plaintiff with cocaine and cannabis dependence, depression, and anxiety. (*Id.*) He additionally noted that, while continuing treatment, Plaintiff may have emerging psychological symptoms and need to be re-assessed. (*Id.*)

On December 11, 2013, Plaintiff returned to Dr. Pitch. (*Id.* at ¶ 48.) Dr. Pitch noted that Plaintiff appeared dedicated to sobriety, attended Narcotics Anonymous meetings, reported no

---

moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* (quotation marks omitted).

marijuana use, and asked to start medication management for anxiety and depression. (*Id.*) Upon examination Plaintiff appeared cooperative, alert, and oriented with adequate grooming and hygiene, and possessed a euthymic mood and intact memory, concentration and attention. (*Id.*) Then, on December 26, 2013, Plaintiff began group therapy, and it was noted that Plaintiff had a co-existing psychiatric disorder and prior treatment for mental illness. (*Id.* at ¶ 49.) Indeed, though a discharge note from the Pederson-Krag Center noted Plaintiff had shown "improvement" after one month of group therapy, Plaintiff's attendance ultimately became "sporadic" and eventually stopped attending treatment. (*Id.* at ¶ 50.)

In January 2014, Plaintiff met with Dr. Pitch and reported that he remained on some medications, discontinued others due to side effects, but otherwise reported that his motivation and energy had improved, and that he exercised each morning. (*Id.* at ¶ 51.) An exam showed Plaintiff appeared cooperative, alert, and oriented with adequate grooming and hygiene; a euthymic mood; and intact memory, concentration and attention, and insight and judgment. (*Id.*) In February of 2014, Plaintiff met with Dr. Pitch and reported "steady, consistent sobriety." (*Id.* at ¶ 52.) Subsequently, in July 2016, Plaintiff sought services from Catholic Charities for issues related to a drunk driving arrest and, while there, reported symptoms of depression such as sadness, isolating, being unmotivated, and little interest and pleasure in doing things, "odd sleep patterns," mood swings daily, racing thoughts, obsessional thinking, and several delusions, such as being a god and followed by the FBI, as well as reporting marijuana and alcohol use. (*Id.* at ¶¶ 54-56.)  Due to non-compliance with care, Catholic Charities discharged Plaintiff in 2017. (*Id.* at ¶ 57.) Then, on October 16, 2016, Plaintiff was referred for inpatient psychiatric admission due to schizoaffective disorder after reporting to have been delusional, sitting at home doing nothing, paranoid and not eating or sleeping. (*Id.* at ¶ 58.)

8

In February 2017, Plaintiff met with Laura Pisani, M.D., for review of his GSD. (*Id.* at ¶ 59.) Plaintiff reported that, since 2008, his liver levels were "almost normal without being [] on a diet," and that an ultrasound of his liver performed in the past year "was normal." (*Id.*) Upon examination, Plaintiff appeared alert and cooperative with no abnormalities, thus metabolic workup for monitoring of GSD was suggested at that time. (*Id.*) In May 2017, Plaintiff returned to Dr. Pisani who reported that Plaintiff has GSD type IIIb.  (*Id.* at ¶ 60.)  There, Plaintiff recounted his psychiatric, substance abuse, and legal issues, admitting to repeated use of powder cocaine and daily marijuana use. (*Id.*) For treatment, Dr. Pisani recommended that Plaintiff meet with her office's social worker to assist in admitting him to a psychiatric facility due to suspected schizoaffective disorder. (*Id.*)

In June 2017, Plaintiff was referred for psychiatric admission at The Haven at Westchester (a division of NY-Presbyterian Hospital) by his mother. (*Id.* at ¶ 61.) Plaintiff's symptoms at the time included hallucinations and preoccupations, which occurred in the context of him having been non-compliant with treatment and medications for a few years. (*Id.*)  He reported visual hallucinations of UFOs, reading words backwards, and looking for signs of great events. (*Id.*) His parents reported a significant family history of mental illness  including schizophrenia and depression. (*Id.*) Plaintiff "did not want [to be admitted] at [that] time," and was not admitted into care. (*Id.*) In January 2019, Plaintiff appeared cooperative with a normal appearance, euthymic mood, logical and normal thought process, normal cognition, and normal insight, in addition to impaired judgment, a constricted affect, and delusions of persecution and reference. (*Id.* at ¶ 63-64.)

In July 2020, Plaintiff was admitted to Stony Brook University Hospital for decompensated behavior, which occurred in the context of not taking medications for six

months. (*Id.* at ¶ 68.) Schizoaffective disorder, bipolar type, was the principal diagnosis following Plaintiff's mother reporting that she and the family had been receiving bizarre text messages from Plaintiff, including that he believes he is God and has powers that other people do not have. (*Id.*) Secondary diagnoses included cocaine, alcohol, and cannabis dependence. (*Id.*) After a 12-day stay, Stony Brook discharged Plaintiff to Brunswick hospital for additional treatment. (*Id.*)

In November 2020, Plaintiff returned to Brunswick Hospital for treatment of his schizoaffective disorder where he denied drug use, but reported drinking one liter of "hard liquor per day" and reported non-compliance with medications. (*Id.* at ¶ 69.) He also displayed paranoid ideation with belief that he was living in hell and someone wants to kill him, appeared tense, irritable, anxious, internally preoccupied, displayed paranoid ideation, angry, and depressed. (*Id.*) During inpatient care, Plaintiff's medications were restarted, and he began detox for alcohol use, which resulted in "excellent improvement" in symptoms, and was eventually discharged on December 4 "in excellent control." (*Id.*)

In a December 2020 report from the Family Service League, Plaintiff's provider of 2.5 years opined that Plaintiff had no limitation in understanding, remembering, or carrying out simple instructions or making judgments on simple work-related decisions. (*Id.* at ¶ 70.) The provider opined that Plaintiff had mild limitation in understanding and remembering complex instructions, and mild/moderate limitation in carrying out complex instructions, but did not indicate any social limitations. (*Id.*) However, the provider further stated that he or she was unable to evaluate and assess Plaintiff in a work environment. (*Id.*)

### d. *Non-Medical Evidence*

In a January 2020 written function report, Plaintiff reported that he was disheveled and bathed infrequently. (*Id.* at ¶ 12.) Though he cared for his pet cat, Plaintiff needed reminders to take care of his personal needs, for grooming, and to take his medications. (*Id.*) Plaintiff prepared frozen foods and cold cuts for meals on a daily basis, he used the dishwasher and went outside every day, he could walk and ride in a car, he shopped for food and cigarettes and occasionally for clothing. (*Id.*) Further, he had difficulty getting along with others, and did not handle stress or change in schedule well because of anxiety and depression. (*Id.*). Social functions and most activities gave him anxiety, and he self-medicated with marijuana to calm himself. (*Id.*) Indeed, these results were largely the same conclusions drawn in a December 2019 third-party function report completed by Plaintiff's father, Robert Anderson. (*Id.* at ¶ 13.)

### e. *Plaintiff's Education and Work Experience*

Plaintiff possesses a high school education and his high school records demonstrate a history of special education. (*Id.* at ¶¶ 11, 29.) Indeed, intelligence testing from 2003 showed an average full-scale IQ of 93, whereas in 2007 Plaintiff's intelligence showed a low-average full-scale IQ of 86. (*Id.* at ¶ 30.) In January 2009, Plaintiff's high school completed an individualized education plan ("IEP") which noted Plaintiff was functioning below grade level in writing, did not exercise appropriate social judgment, displayed low self-esteem, was frustrated by school related responsibilities, could be inflexible and difficult with transitions, and engaged in attention seeking behavior. (*Id.* at ¶ 34.) Plaintiff attended one year of college in 2010. (*Id.* at ¶ 35.)

Vocationally, Plaintiff completed heating, ventilation, and air-conditioning ("HVAC") training in 2009, worked as a maintenance worker in both 2013 and from October 2018 to April 2019, and by August 2013, Plaintiff was working 6 days per week doing maintenance deliveries

at a high-end private community on Fire Island. (*Id.* at ¶¶ 11, 35, 44.) On December 26, 2013, Plaintiff, during group therapy, recounted his work history, reporting he had left a maintenance job for "[p]ersonal reasons" after 3 months, left Subway after he "stole money from them and [] left" after 4 months, and was fired from a job painting boats. (*Id.* at ¶ 49.)

## II.   Procedural History

On March 12, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's decisions the final decisions of the Commissioner subject to judicial review under 42 U.S.C. § 405(g). (*Id.* at ¶ 7.) Subsequently, on March 18, 2022, Plaintiff commenced this action in the Eastern District of New York pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of the ALJ's Decision. (*See* ECF No. 1.) Originally assigned to the Hon. Diane Gujarati, the parties later consented to the undersigned for all purposes. (*See* ECF No. 16.) The undersigned directed that Plaintiff's Motion, Defendant's Opposition, and Plaintiff's Reply be bundle filed on ECF on or before September 18, 2023. (Electronic Order dated July 20, 2023). The parties timely filed their motions. (*See* ECF Nos. 18, 20, 21.)

## III.   The Parties' Contentions

### a.   *Plaintiff's Motion for Judgment on the Pleadings*

In support of his Motion for Judgment on the Pleadings, Plaintiff argues: (i) the ALJ's finding that Plaintiff did not meet or equal listing 12.03 is not supported by substantial evidence, and (ii) the ALJ failed to develop the record by failing to obtain a single medical opinion from an examining or treating medical source. (*See generally*, ECF No. 20-1.)

*First*, Plaintiff avers that the ALJ "did not provide any meaningful discussion regarding his finding" that Plaintiff did not meet the criteria in listing 12.03. (*Id.* at p. 12.) Plaintiff

contends that Anderson's schizophrenia satisfies the requirements of subsections A and B of § 12.03 considering:

> (1) there is substantial evidence in the record of medically documented persistence of delusions, hallucinations, and emotional withdrawal/isolation; (2) Mr. Anderson's difficulties in maintaining social functioning are marked; and (3) Mr. Anderson has marked difficulty with concentration, persistence, and pace

*Id.* at pp. 12-13.

Plaintiff maintains that medical records indicate Anderson suffers from visual hallucinations, reads words backwards, and is "religiously preoccupied." (*Id.* at p. 13.) Indeed, he has been hospitalized in 2020 for schizophrenia and, based upon Plaintiff's father's report, Plaintiff cannot function in society given his "extreme paranoia." (*Id.*) As for marked difficulties in maintaining social functioning, Plaintiff contends his high school records exhibit "oppositional behavior," he maintains a strained familial relationship, has a history of aggressive behavior, and has minimal work history due in part to his difficulty interacting with others. (*Id.*) Plaintiff further avers that there is no evidence that HVAC training and completing one year of college involve interactions with others. (*Id.*)

Furthermore, regarding alleged marked difficulties with concentration, persistence, and pace, Plaintiff argues his June 2012 discharge summary report demonstrates difficulty with attention and concentration. (*Id.*) Plaintiff's father, in addition, reported his son struggled in school with a low attention span. (*Id.*) Plaintiff alleges that although the ALJ found Plaintiff to have a moderate limitation in this area largely because he had a driver's license in 2009 and worked part time in 2008, 2010, and 2011, during these years Plaintiff had limited earnings, he worked part-time, was unable to hold a job for long periods of time, and the record fails to demonstrate that Plaintiff could maintain full-time work. (*Id.*)

*Second*, Plaintiff argues the ALJ failed to develop the record despite the ALJ's duty to do so where, like here, Plaintiff asserts a long history of mental illnesses (e.g., depression, anxiety, bipolar disorder, and schizophrenia). (*Id.* at p. 15) Notably, Plaintiff contends that "despite over twelve hundred pages of records, there is **not a single medical opinion from an examining or treating medical source**." (*Id.*) (emphasis in original). Specifically, without such medical opinions, Plaintiff maintains that the ALJ's decision on Plaintiff's RFC—that Anderson is capable of work at all exertional levels with limitations—was not supported by substantial evidence. (*Id.*) As such, Plaintiff insists that "upon remand," the ALJ obtain an RFC assessment from one or more of Anderson's examining or treating physicians. (*Id.*)

Accordingly, Plaintiff submits that the ALJ erred in his decision and requests that the case be remanded. (*Id.* at p. 17.)

### b. *Defendant's Cross-Motion for Judgment on the Pleadings*

In support of its Cross Motion for Judgment on the Pleadings, Defendant argues: (i) substantial evidence supports the ALJ's conclusion that Plaintiff's schizoaffective disorder did not meet the requirements of listing 12.03, and (ii) the record was fully developed. (*See generally*, ECF No. 18-1.) As such, Defendant requests that the Court reject Plaintiff's claims, reject his "invitation to reweigh the evidence," and affirm the ALJ's decision. (*Id.* at p. 6.)

*First*, Defendant argues the Court should affirm the ALJ's decision because he "supportably concluded that Plaintiff did not meet listing 12.03 because Plaintiff had only moderate or mild limitation in the functional domains of interacting with others and concentrating, persisting, or maintaining pace." (*Id.* at p. 8.) In the context of substance abuse, as Defendant maintains, the ALJ properly determined Plaintiff was moderately limited in interacting with others because he was cooperative during exams, completed HVAC training,

14

and attended one year of college. (*Id.* at pp. 7, 9.) Additionally, Defendant avers the ALJ's determination that Plaintiff had a mild limitation in interacting with others, in the context of sobriety, was adequately supported through evidence of Plaintiff's treatment records. (*Id.* at p. 8.)

Similarly, Defendant maintains the ALJ adequately supported its moderate limitation conclusion regarding Plaintiff's ability to concentrate, persist, or maintain pace during periods of substance abuse, especially in light of Plaintiff's possession of a driver's license and part time work in 2008, 2010, and 2011. (*Id.*) In the context of sobriety, Defendant contends the ALJ's finding of only a "mild limitation" in concentration, persistence, and maintain pace was proper, specifically noting the ALJ found "no evidence [that Plaintiff] remained impaired in this area when sober." (*Id.*) (citing ECF No. 8 at p. 23 (ALJ Hr'g Tr. at p. 12)).

Additionally, Defendant alleges that Plaintiff fails to explain how the evidence he relied upon shows he met part A and B, and most of the evidence Plaintiff cites to falls outside of the Relevant Period, including all evidence in support of part A. (*Id.* at p. 10) Indeed, Defendant notes that Plaintiff failed to explain how the evidence from outside this period relates back to the Relevant Period. (*Id.* at p. 11.) As for the evidence that falls within the Relevant Period, Defendant alleges the evidence does not support Plaintiff's claims of marked limitation. (*Id.*) As such, Defendant avers that Plaintiff's selected findings made in an attempt to prove he met parts A and B "is nothing more than an invitation for the Court to reweigh the evidence, which is not the Court's role." (*Id.* at p. 10.)

*Second*, Defendant argues the administrative record is fully developed as it contains multiple medical opinions from Plaintiff's examining medical providers and there are no "obvious gaps" in the record. (*Id.* at p. 11; ECF No. 18-2 at p. 2.) Specifically, in the context of substance abuse, Defendant asserts that the ALJ assessed reports developed by state agency

medical and psychological consultants containing opinions on Plaintiff's conditions and found some opinions to be persuasive and others unpersuasive. (*Id.* at p. 13.) Additionally, in the context of sobriety, Defendant contends the ALJ looked to several opinions from Plaintiff's medical providers who provided findings consistent with low average cognitive abilities. (*Id.*) Indeed, contrary to Plaintiff's suggestion, Defendant posits that the ALJ relied on medical opinions in making its RFC determination and, as such, substantial evidence supports this determination (*Id.* at p. 15.) Accordingly, Defendant submits that this Court should affirm the ALJ's decision.

### c.   *Plaintiff's Reply in Support of its Motion for Judgment on the Pleadings and in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings*

In his Reply in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings, Plaintiff solely argues that the ALJ's finding that Plaintiff did not meet or equal listing 12.03 is not supported by substantial evidence and the ALJ "arbitrarily substitute[d] his own judgment for a competent medical opinion." (ECF No. 21 at p. 2.) (citation omitted). To support this assertion, Plaintiff cites the same evidence and reiterates the identical arguments made in his Motion for Judgment on the Pleadings. (*See id.* at pp. 2-4.)

### <u>DISCUSSION</u>

### I.   <u>Legal Framework</u>

When determining if the Social Security Administration's denial of disability benefits was warranted, the court will review *de novo* "whether the correct legal principles were applied and whether substantial evidence supports the decision." *Balotti v. Comm'r of Soc. Sec.*, 605 F. Supp. 3d 610, 613 (3d Cir. 2022) (quoting *Butts v. Barnhard*, 388 F.3d 377, 384 (2d Cir. 2004)). Here, the correct legal principles are the five-step inquiry described as the "Social Security

Disability Standard" outlined below. "If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must 'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'" *Balotti*, 605 F. Supp. 3d at 613 (quoting *Brault v. Soc. Sec. Admin'n Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam)).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Cardin v. Comm'r of Soc. Sec.*, No. 23-755, 2024 WL 2180216, at *1 (2d Cir. May 15, 2024) (citing *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)) ("The substantial evidence standard requires that we accept the agency's factual findings unless a reasonable factfinder would be compelled to conclude otherwise."). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1984) (per curiam)).

As such, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it." *State of New York ex rel. Bodnar v. Sec. of Health and Human Servs.*, 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision must be supported by "adequate findings . . . having rational probative force." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *see also Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (under the substantial evidence standard of review, the plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record, rather

than merely disagree with the ALJ's weighing of the evidence or argue that evidence in the record could support his or her position).

"Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Thus, an individual must be found disabled when his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A). The correct legal principle that ALJs must undertake to ascertain a claimant's status is the sequential five-step inquiry of the Social Security Disability Standard outlined by the Commissioner's regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. According to this framework, a claimant will be found disabled if the Commissioner determines:

> (1) that the claimant is not working, (2) that he has a "severe impairment," (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find his disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)).

At step one, the Plaintiff must prove s/he is not employed in "substantial gainful activity" ("SGA").   "[SGA] is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. "'Substantial work activity' is work activity that involves doing significant physical or mental activities." (*Id.* § 404.1572(a)). "Gainful work activity" is work that is usually done for pay or profit, "whether or not a profit is realized." (*Id.* § 404.1572(b)).

At step two, the Plaintiff must prove s/he is significantly limited in his/her physical or mental abilities to perform basic work activities. "Basic work activities" are "activities and aptitudes necessary to do most jobs." *Sharmara A. v. Comm'r of Soc. Sec.*, No. 23-CV-6171 (LJV), 2023 U.S. Dist. LEXIS 230336, at *5 (W.D.N.Y. Dec. 28, 2023) (quoting 20 C.F.R. § 404.1522(b)).

At step three, Plaintiff must prove that the impairments meet or are equivalent to one of the impairments listed in 20 C.F.R. 404 to render him as "disabled." "If the severe impairments do not meet or equal a listed impairment, an administrative law judge assesses the social security claimant's residual function capacity based on all the relevant medical and other evidence in the case record." *McAllister v. Colvin*, 205 F. Supp. 3d 314, 327 (E.D.N.Y. 2016) (quoting 20 C.F.R. § 404.1520(e)).

At step four, the plaintiff must prove that he is incapable of meeting the physical and mental demands of work; and whether the ALJ failed to develop the record. At step five, the Commissioner bears the burden to demonstrate that "there is work in the national economy that the claimant can do" upon consideration of the plaintiff's RFC, age, education, and prior work experience, are there any other jobs Plaintiff could perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

"Remand for further development of the evidence is appropriate where there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Kirkland v. Astrue,* No. 06 CV 4861(ARR), 2008 WL 267429, at *8 (E.D.N.Y. Jan. 29, 2008); *see also Butts,* 388 F.3d at 386 (internal citations omitted) ("Remand for additional proceedings is particularly appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would ... plainly help to assure the proper disposition of a claim."). "On

19

the other hand, when there is persuasive proof of disability in the record and no apparent basis to conclude that a more complete record might support the Commissioner's decision, further evidentiary development would not serve any purpose. In that case, the court should reverse the Commissioner's decision and remand solely for the calculation of benefits." *Kirkland*, 2008 WL 267429, at *8 (internal citations omitted) (cleaned up).

## II.    <u>Analysis</u>

Plaintiff asserts that the ALJ decision should be reversed because: (i) the ALJ's finding that Anderson did not meet or equal listing 12.03 (relating to schizophrenia) is not supported by substantial evidence[5]; and (ii) the ALJ failed to develop the record by failing to obtain a single medical opinion from an examining or treating medical source. (ECF NO. 20-2 at p. 1.) In response, Defendant counters that: (i) the ALJ's conclusion that Plaintiff's schizoaffective disorder did not meet the requirements of listing 12.03 is supported by substantial evidence as Plaintiff had no more than moderate limitation in interacting with others, and in concentrating, persisting, or maintaining pace; and (ii) the record was fully developed and contains multiple medical opinions from Plaintiff's examining medical providers. (ECF No. 18-2 at pp. 1-2.) The Court considers each of the parties' arguments on these points in turn.

### a.   *Legal Framework for Listing 12.03*

At step three of the ALJ's five-step process, the ALJ must determine whether the claimant's impairments meet or equal any listing. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). A "Listing of Impairments" describes the physical or mental impairments considered severe enough to prevent a plaintiff from doing any gainful activity, regardless of age, education, or

---

[5] Plaintiff specifically objects that he has marked, and not moderate, difficulties in two areas: maintaining social functioning (interacting with others), and in concertation, persistence, and pace. (ECF No. 20-1 at pp. 13-14.)

work experience. *Bechard v. Colvin*, 2024 WL 5274654, at *2 (2d Cir. Jan. 3, 2025) (citing 20 C.F.R. § 404.1525(a)).

If the claimant meets or equals one of the listings, the evaluation process is concluded, and the individual is considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Pratt v. Astrue*, No. 7:06-CV-0551 (LEK/DRH), 2008 WL 2594430, at *6 (N.D.N.Y. June 27, 2008). To meet a listing, a plaintiff must show that his or her medically determinable impairment satisfies all of the specified criteria in a listing. *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1525(d)). Where a claimant's impairment manifests only some of those criteria, such impairment does not qualify regardless of its severity. *Sullivan v. Zebley*, 493 U.S. 521, 520 (1990). The claimant bears the burden of proof at this step of the "sequential inquiry". *Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2022); *see also Vella v. Astrue*, 634 F. Supp. 2d 410, 418 (S.D.N.Y. 2009) (plaintiff bears the burden of establishing the existence of a disability). Indeed, an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982).

"To meet the requirements of listing 12.03, the listing for schizophrenia spectrum and other psychotic disorders, the claimant must meet the requirements of 12.03(A) and either 12.03(B) or 12.03(C)."[6] *Nieves v. Colvin*, No. 1:16-cv-00286 (FB), 2017 WL 5159765, at *2 (E.D.N.Y. Nov. 7, 2017); *see also Ashley A.M. v. Commissioner of Social Security*, No. 6:23-cv-0738 (BKS/TWD), 2024 WL 4442703, at *4 (N.D.N.Y. July 2, 2024) (recognizing that to satisfy

---

[6] Here, the ALJ focused its analysis on whether Plaintiff met Paragraphs B and Part C. Not considering Paragraph A, however, is not futile because claimant must satisfy either B or C to meet the requirements of a listing 12.03. *See Velez v. Astrue*, No. 1:11-CV-1487 (MAD), 2013 WL 474281, at *6 (N.D.N.Y. Feb. 7, 2013).

a listing standard for impairments under 12.03, a claimant's "'mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C.'").

"Section 12.03A requires medical documentation of one or more of the following: delusions or hallucinations, disorganized thinking (speech), or grossly disorganized behavior or catatonia." *Id.* Section 12.03B requires "at least two of the following limitations of mental functioning related to the impairment: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration." *Id.* These functional areas are marked on a five-point scale: "None, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4). In determining whether a claimant has marked limitations of mental functioning, the ALJ must consider all the relevant medical and non-medical evidence in the record. *See Tucker v. Massanari*, No. 99 Civ. 12037 (AJP), 2001 WL 868031, at *7 (S.D.N.Y. Aug. 1, 2001). Relevant factors include how clinicians diagnose the claimant's level of disorder, the claimant's mental functioning in daily activities and work settings, the overall effect of limitations, and the effects of support, supervision, and structure on claimant's functioning. *Nieves*, 2017 WL 5159765, at *2. Lastly, to satisfy Section 12.03C, a claimant's mental disorder must be "serious and persistent" with a medically documented history of the existence of the disorder over a period of at least two years. *Langston v. Commissioner of Social Security*, No. 21-CV-00723 (KAM), 2024 WL 127850, at *5 (E.D.N.Y. Jan. 11, 2024) (citing C.F.R. § Pt. 404, Subpt. P, App. 1); *see also Johnson v. Astrue*, 493 F. Supp. 2d 652, 656-57 (W.D.N.Y. 2007).

**b.** *The ALJ Correctly Determined Plaintiff's Schizoaffective Disorder did not Meet the Requirements of Listing 12.03*

Here, the ALJ's decision that Plaintiff did not meet or equal listing 12.03 relating to schizophrenia was supported by substantial evidence. At the outset, the Court agrees with the ALJ that "[t]he record contains limited evidence pertaining to the period at issue in this claim." (ECF No. 8 at pp. 18, 40.) In fact, most, if not all, of the arguments presented by Plaintiff in support of remand involved reports and findings falling outside of the Relevant Period.[7] For example, Plaintiff's argument that he has "marked difficulties" in maintaining social functioning and difficulty with concentration, persistence, and pace were supposedly demonstrated through school records from 2007, June 2012 discharge reports, medical reports from December of 2013, medical evaluations from 2017, Plaintiff's father's written report from 2020[8], and mentions of hospitalization in 2020 due to aggressive behavior. (*See* ECF No. 20-1 at pp. 13-14.)

Consideration of evidence outside the relevant periods of disability, including after the date of last insured, is not afforded significant or convincing weight when reviewing whether an ALJ's conclusions were supported by substantial evidence. *See Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762 (S.D.N.Y. 2017) (collecting cases demanding that a claimant show that a currently existing condition rendered him disabled prior to the date of last insured, not after the relevant period expires); *see also Lau v. Commissioner of Social Security*, 339 F. Supp. 3d 421, 425 (S.D.N.Y. 2018) ("Because the record contained "insufficient evidence prior to [claimant's] date

---

[7] Plaintiff's arguments that Plaintiff suffers from delusions, hallucinations, and emotional withdrawal are supported by a June 2017 psychiatry report, a psychiatric evaluation from 2019, a 2020 report from Plaintiff's father, and hospitalization records from 2020. (*See* ECF No. 20-1 at p. 13 (citing Tr. pp. 753, 1070, 377, 1096)).

[8] In Plaintiff's Reply, he contends that although this report falls outside of the Relevant Period, Plaintiff's father discuss Plaintiff's impairments during the disability period. (ECF No. 21 at p. 3, n.1 (citing Tr. p. 377.))

last insured documenting significant functional limitations arising from his mental impairments, the ALJ concluded that Lau did not suffer from a severe mental impairment during the Relevant Period.") (internal quotations omitted).

Importantly, here, the ALJ considered evidence during the Relevant Period in determining whether Plaintiff meet or equal listing 12.03 in both the DIB and CDB claims.[9]  For understanding, remembering, or applying information, the ALJ determined that Plaintiff had a moderate limitation, namely because Plaintiff's January 2009 school record indicates that his full-scale IQ was "within average." (*See* ECF No. 8 at pp. 16, 37.) Moreover, the ALJ considered that Plaintiff maintained part-time work during for several years during the Relevant Period after reviewing Plaintiff's earnings records. (*Id.*) As such, the ALJ determined that despite a history of learning disability, "the evidence does not demonstrate markedly impaired cognitive function." (*Id.* at pp. 19, 40.) Furthermore, if substance abuse was stopped, the ALJ determined Plaintiff would have a mild limitation, a conclusion drawn from reviewing Dr. Pitch's records which highlight "unimpaired memory and concentration" and "intact thought process" during sobriety. (*Id.* at pp. 23, 44.)

Though Plaintiff does not specifically object to the ALJ's finding in this category, in light of the limited evidence available during the Relevant Period, the ALJ sufficiently considered the aforementioned records concerning Plaintiff's cognitive function in reaching its determination for understanding, remembering, or applying information. *See Pena v. O'Malley*, No. 23 Civ. 6720 (NSR) (JCM), 2024 WL 3813829, at *14 (S.D.N.Y. July 3, 2024) (determining the ALJ's "step three findings were supported by substantial evidence" after he considered plaintiff's full-

---

[9] The ALJ addressed all four limitation categories in the DIB and CDB decisions each and considered whether these limitations existed during both periods of substance use and periods of sobriety.

scale IQ), *report and recommendation adopted*, 2024 WL 4345733 (S.D.N.Y. Sept. 30, 2024);

*Difiglia v. Commissioner of the SSA*, No. 22-CV-06825, 2024 WL 1332502, at *11 (E.D.N.Y.

Mar. 28, 2024) (finding an ALJ's conclusion of a moderate limitation in understanding,

remembering, or applying information was supported by substantial evidence through

consideration of medical opinions and high school performance).

Furthermore, in both CDB and DIB decisions, with respect to interacting with others, the

ALJ found Plaintiff to have a moderate limitation, because, although school records in 2009

show he exhibited "low self-esteem, impaired social judgment, was easily frustrated, and

demonstrated attention-seeking behaviors," Plaintiff completed HVAC training in 2009 and one

year of college shortly thereafter. (*Id.* at pp. 16, 37.) The ALJ further noted, in the DIB decision

specifically, that no other evidence existed through the date last insured to support more than a

moderate limitation. (*Id.* at 16.) Ordinarily, an ALJ's conclusion that plaintiff has a moderate

limitation in interacting with others after consideration plaintiff's attendance at college and

participation in vocational training programs will be considered adequately supported. *See*

*Langston*, 2024 WL 127850, at *5 (finding no more than moderate limitations where plaintiff

attended college and participated in vocational training programs).  Furthermore, though Plaintiff

argues there is no evidence that completing a training and attending college involved interacting

with others, "[a] moderate limitation in interaction can be reasonably interpreted as an ability to

occasionally interact." *Cynthia A.E. v. Commissioner of Social Security*, No. 5:22-CV-0974,

2023 WL 9116628, at *8 (N.D.N.Y. Oct. 17, 2023), *report and recommendation adopted*, 2023

WL 8432332 (N.D.N.Y. Dec. 5, 2023).

In addition, the ALJ adequately supported its conclusion that if substance abuse was

stopped, Plaintiff's limitation would be mild, especially after analyzing progress notes taken by

Dr. Pitch and conclusions arrived at by the Pederson-Krag Center which both memorialize that during periods of sobriety, Plaintiff exhibited good hygiene and cooperative behavior. (*Id.* at pp. 23, 44.); *see Kristy M. v. Kijakazi*, No. 22-CV-1004DGL, 2023 WL 7124524, at *2 (W.D.N.Y. Oct. 30, 2023) (granting defendant's cross motion for judgment on the pleadings where, *inter alia*, the ALJ found "if plaintiff stopped abusing controlled substances, plaintiff would have only mild limitations . . . in interacting with others" after reviewing medical records of the extent of mental health symptoms versus substance abuse).

With regard to concentrating, persisting, or maintaining pace, even when including substance use, the ALJ noted Plaintiff had a moderate limitation. (ECF No. 8 at pp. 16, 37.) Specifically, though his academic records from 2009 reflect difficulty completing tasks, Plaintiff had a driver's license in 2009 and worked part time during 2008, 2010, and 2011. (*Id.*) Notably, these sets of facts are those appropriately considered by an ALJ in order to support a finding of a moderate limitation in this context. *See Nicolas D. v. Commissioner of Social Security*, No. 1:23-CV-00052, 2024 WL 655599, at *5 (W.D.N.Y. Feb. 16, 2024) (collecting cases where an ALJ properly considers a claimant's ability to attend college and engage in part-time work throughout the relevant time period to determine the severity of a disability); *see also Ernest v. Commissioner of Social Security*, No. 1:22-CV-00509, 2023 WL 5738449, at *4-5 (W.D.N.Y. Sept. 6, 2023) (holding that the ALJ's reliance on plaintiff's possession of a driver's license was proper to conclude a moderate limitation in concentrating, persisting or maintaining pace existed); *see also Riddick v. Saul*, No. 20-CV-05396 (AMD), 2022 WL 784722, at *4 (E.D.N.Y. Mar. 15, 2022) (noting that driving a car required concentration and persistence, thus supporting a finding of a moderate limitation).

Furthermore, the ALJ determined "[t]here is no evidence the claimant remained impaired in this area when sober" after reviewing psychological testing results in February and March of 2012, in addition to analyzing records formed by Dr. Pitch memorializing that Plaintiff maintained an organized and concise thought process, intact attention, and articulate behavior after being sober for nine months. (*Id.* at pp. 23, 45.) Here, the ALJ properly relied upon these medical and psychological findings to evaluate the effect of sobriety on a claimant's purported disability. *See David C. v. Commissioner of Social Security*, No. 1:22-CV-00965, 2024 WL 376598, at *5 (W.D.N.Y. Feb. 1, 2024) (granting defendant's motion for judgment on the pleadings after noting the ALJ's recognition and reliance on prior treatment records indicating that since plaintiff attained sobriety he exhibited "few mental status abnormalities with no evidence of psychological deficits . . . .").

Lastly, for adapting or managing oneself, the ALJ stated Plaintiff had a moderate limitation considering his substance use, "actively abusing marijuana in 2007 and 2008" and cocaine in 2011 and early 2012, and ceasing mental health treatment. (*Id.* at pp. 16-17, 38); *see Tina v. Commissioner of Social Security*, No. 1:21-CV-219 (JLS), 2023 WL 4286039, at *4 (W.D.N.Y. June 29, 2023) (finding the ALJ's conclusion supported by substantial evidence after considering plaintiff "ceased all mental health treatment," no longer took medications to manage her symptoms, and was discharged from mental health programs). Moreover, the ALJ weighed the fact that Plaintiff's school records demonstrated difficulty achieving progress during these years and that he was treated at the Office of Addiction Services and Supports ("OASAS") at the end of the Relevant Period for marijuana and cocaine use. (*Id.* at pp. 16, 38.) Though Plaintiff does not explicitly object to the ALJ's conclusion on this limitation, the Court nonetheless finds

that the ALJ's conclusion was supported by substantial evidence, though limited in the Relevant Period.

Furthermore, the ALJ concluded Plaintiff experienced moderate limitations for adapting or managing oneself if substance abuse was stopped because although Dr. Pitch found the claimant demonstrated good hygiene and stable moods with increasing sobriety, evidence like Dr. Valz's June 2012 discharge report noting "it [was] truly questionable as to whether [Plaintiff] truly accepted" that using drugs triggers and exacerbates psychotic symptoms, suggests that maintaining sobriety and complying with medical treatment may be an ongoing issue. (*Id.* at pp. 24, 45); *see Victoria v. Commissioner of Social Security*, No. 19-CV-6810, 2020 WL 7258119, at *7 (W.D.N.Y. Dec. 9, 2010) (highlighting an ALJ's decision that if plaintiff stopped substance abuse, her limitations would be moderate for adapting or managing oneself in light of specific examples cited in the record relating to her mental and psychological disorders).

Additionally, the ALJ considered whether Paragraph C of 12.03 was satisfied in both instances. The ALJ noted that the record was silent as to whether Plaintiff had only "marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life." (ECF No. 8 at pp. 17, 38.) Particularly, the ALJ formed this conclusion after considering that Plaintiff was able to work part-time in 2008, 2010, and 2011, attend and complete HVAC training in 2009, and attend one year of college in 2009-2010. (*Id.*) Considering the scope of the Relevant Period, and limited evidence therein, the ALJ's determination as to Paragraph C was supported by substantial evidence and supports the ALJ's decision that Plaintiff failed to meet or equal listing under 12.03. *See Hussain v. Commissioner of Social Security*, No. 22-CV-03880 (HG), 2023 WL 8189750, at *4, *9 (E.D.N.Y. Nov. 26, 2023) (concluding it was clear the ALJ's opinion, which

28

included a determination that Paragraph C was not satisfied where "the record [did] not show that [plaintiff] has a minimal capacity to adapt to changes in her environment, or to demands that are not already part of her daily life," was "amply supported by substantial evidence").

Accordingly, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's schizoaffective disorder did not meet the requirements of Listing 12.03.

### III.    *The ALJ Adequately Performed His Affirmative Duty to Develop the Administrative Record*

Prior to determining if the Commissioner's final decision is backed by substantial evidence under 42 U.S.C. § 405(g), the Court must first ensure that the ALJ granted the plaintiff a full hearing under the Secretary's regulations and thoroughly developed the administrative record. *See Scott v. Astrue*, 2010 U.S. Dist. LEXIS 68913, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  As such, in Social Security proceedings, the ALJ must affirmatively develop the record on behalf of all claimants. *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). As part of this duty, the ALJ must investigate the facts and develop the arguments both for and against granting benefits. *Id.* Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Sainsbury v. Commissioner of Social Security*, No. 18-CV-0513-JWF, 2019 WL 4643607, at *2 (W.D.N.Y. Sept. 24, 2019).

Moreover, the ALJ must develop the record even where the claimant has legal counsel. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). The Appeals Council then evaluates the entire record, including any new and material evidence submitted if it is chronologically relevant, to determine if the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently on record. *See* 20 C.F.R. § 404.970(b); *Bushey v. Colvin*, 552 F. App'x 97, 98 (2d Cir. 2014).

Here, the Court finds the ALJ did perform and satisfy his affirmative duty to develop the administrative record. Indeed, the ALJ developed the record by considering Plaintiff's limitations both in the context of substance abuse and in the context of sobriety. In forming its opinions in these circumstances, the ALJ considered not only the medical and psychological evidence presented to him, but also analyzed this evidence against Plaintiff's statements made during the administrative hearing, thereby supporting a finding that the record was sufficiently developed. *See John W. v. Saul*, No. 20-CV-376 (JLS), 2022 WL 3142083, at *4 (W.D.N.Y. Aug. 5, 2022) (determining that the ALJ properly developed the record where the ALJ considered and weighed the mental health opinions in the record with the subjective evidence from plaintiff).

In contrast to Plaintiff's argument that there exists "not a single medical opinion from an examining or treating medical source" in this extensive record (ECF No. 20-1 at p. 15), the Court notes that the duty to develop the record does not extend to speculative or vague claims of missing evidence or require the ALJ to obtain the alleged missing evidence on behalf of the claimant. *See Perez*, 77 F.3d at 48 (rejecting Plaintiff's contention that the ALJ failed to develop the record by not obtaining information from the physicians who had ordered the CT of her brain and the MRIs of her spine, where the "ALJ stated that he considered the reports of the results of the CT and MRI tests, and that he found that they did not provide evidence demonstrating that [Plaintiff] was disabled" and where "there [was] nothing to indicate that the reports were inconclusive[,]" and further noting that "the ALJ was not obligated to request further information from the doctors who had ordered the CT and MRIs.")

For example, in *Eric K. S. v. Commissioner of Social Security*, the court determined the ALJ sufficiently developed the record after affording different degrees of weight to the opinions

and medical evidence relating to plaintiff's mental limitations. 2021 WL 826717, at *6 (W.D.N.Y. Mar. 4, 2021). There, the ALJ reviewed the conclusions from state agency psychological consultants, treatment records of a mental health specialist, and findings from plaintiff's treating psychiatrist, all of whom opined at to plaintiff's mental functioning and impairment in light of substance abuse. *Id.* at *4-5. Additionally, because "the record contained opinion evidence, significant treatment records, and plaintiff's testimony," the court noted the ALJ was not required to further develop an already enhanced record. *Id.* at *4. As such, the court rejected plaintiff's assertion that the ALJ did not develop the record by neglecting to include "opinion evidence from an examining or treating source." *Id.*

Similarly, here, the ALJ considered the various opinions and reports formed by those treating Plaintiff, including his endocrinologist (ECF No. 8 at pp. 19, 40), Dr. Valz's discharge report (ECF No. 8 at pp. 20, 41), and state agency medical and psychological consultants (ECF No. 8 at pp. 21, 42). As such, Plaintiff's claim that there is no "opinion evidence from an examining or treating medical source" fails to account for the ALJ's consideration of these different forms of medical and psychological evidence.

Additionally, the ALJ considered both the supportability and consistency of these opinions. Pursuant to amended regulations, claims filed after March 27, 2017[10] will not apply a "presumption of controlling weight" subject to a treating doctor's opinion. *Balotti*, 605 F. Supp. 3d at 616. Instead, the revised regulations for evaluating a doctor's opinion evidence place substantial emphasis on two factors: supportability and consistency. *Id.*, *see* 20 C.F.R. § 404.1520 (a). To avoid legal error, "[a]n ALJ must not only apply supportability and consistency

---

[10] Until March 27, 2017, regulations required application of the so-called "treating physician rule" pursuant to which the opinion of a claimant's treating physician presumptively was entitled to "controlling weight." 20 C.F.R. § 404.1520 (c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

in evaluating medical source opinions but also must explain the analysis of these factors in the decision." *Balotti*, 605 F. Supp. 3d at 617; 20 C.F.R. § 404.1520 (c)(b)(2). The first factor of supportability "refers to the extent to which a medical source's opinion is supported by objective medical evidence and the medical source's explanations." *Balotti*, 605 F. Supp. 3d at 616; 20 C.F.R. § 404.1520 (c)(1).

A medical opinion is considered persuasive when it is more relevant to the objective medical evidence and the medical source's explanations. *See id.* The second element of consistency "refers to the extent to which a medical source's opinion is consistent with other medical or non-medical sources." *Id.* "[I]f two or more medical opinions or prior administrative medical findings are both equally well supported and consistent," the ALJ must consider other factors listed in 20 CFR 404.1520. *See* 20 C.F.R. § 404.1520. These factors are "Relationship with the claimant," "Extent of the treatment relationship," and "Examining relationship." *See id.* § 404.1520 (c)-(e).

Here, the ALJ applied these principles and explained how these factors influenced his decisions. For instance, the ALJ examined prior opinions of State agency medical consultant Dr. Sharif-Najafi—opinions which were later confirmed by another medical consultant, Dr. Sonthineni—that Plaintiff had no physical limitation during "the relevant adjudicative period." (*Id.* at pp. 21. 42.) In forming this conclusion, the ALJ balanced these opinions against the medical evidence presented at the hearing level, yet nonetheless found these doctors' medical opinions persuasive considering Plaintiff's own denial of any significant difficulties from an impairment during a 2008 exam. (*Id.*) Similarly, the ALJ found the reports from state agency psychological consultants not persuasive as they were "not consistent with additional evidence received at the hearing level . . . .". (*Id.*)

Furthermore, in the context of sobriety, the ALJ evaluated the opinions of the Family Services League ("FSL"), Dr. Pitch, and Dr. Valz on Plaintiff's mental functioning. The ALJ, specifically, found Dr. Pitch's opinion that Plaintiff was not restricted at work unpersuasive as it was "not consistent with the claimant's subjective mood . . . or the evidence . . . noted by Dr. Valz." (*id.* at pp. 26, 47), deemed Dr. Valz's reports "not overly persuasive" in light of the duration of care and GAF opinions, but found the FSL's limitation opinion persuasive as it was consistent with prior exams taken of Plaintiff during periods of sobriety. (*Id.* at pp. 25-26, 47). Indeed, after considering each of these conclusions in equal light, the ALJ determined Plaintiff's own statements regarding his symptoms to be inconsistent with the medical and psychological evidence in the record. (*Id.*); *see Artinian v. Berryhill*, No. 16 Civ. 4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) ("It is entirely proper for the ALJ to only credit portions of medical source opinions, or weigh different parts of the same opinion differently.")

Under these circumstances, where an ALJ makes clear which statements or opinions he finds persuasive or unpersuasive based on whether they are consistent with reports and testimony, an ALJ will be deemed to have sufficiently addressed both supportability and consistency factors. *See Garcia v. Acting Commissioner of Social Security*, No. 22-CV-4602 (JLC), 2023 WL 4174181, at *11-12 (S.D.N.Y. June 23, 2023); *see also Artinian*, 2018 WL 401186, at *8 ("[W]hen the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy.")

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (ECF No. 20) is **DENIED** and Defendant's Cross-Motion for Judgment on the Pleadings (ECF No. 18) is

**GRANTED**.  The ALJ's Decision is therefore **AFFIRMED**.  The Clerk of the Court is directed

to enter judgment accordingly and to close the case.

Dated: Central Islip, New York
        February 28, 2025

S O   O R D E R E D:

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge

34